UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER PETER, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>DOORDASH, INC.,<br><br>　　　　Defendant. | Case No. 19-cv-06098-JST<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Re: ECF No. 17 |

Before the Court is Defendant DoorDash, Inc.'s motion to compel arbitration and stay litigation. ECF No. 17. The Court will grant the motion.

## I. BACKGROUND

### A. Factual and Procedural Background

Plaintiffs Jennifer Peter and Karson Theiss are customers of DoorDash, an online and app-based food delivery platform. ECF No. 1 at 2. They allege that DoorDash has engaged in deceptive tipping practices, representing that consumers' tips would benefit drivers but instead using those tips to fund the minimum payments that DoorDash guarantees its drivers. *Id.* On September 25, 2019, Plaintiffs filed a complaint on behalf of themselves and a nationwide class of all consumers who placed a food delivery order via DoorDash within the applicable limitations period and used DoorDash's platform to provide tips to their drivers, as well as Missouri and Illinois subclasses. *Id.* at 15. Plaintiffs bring claims under California's, Missouri's, and Illinois's unfair practices laws, *id.* at 18-23, 25-28, as well as for unjust enrichment and money had and received in both Missouri and Illinois, *id.* at 23-25, 28-30. They seek damages, punitive damages, injunctive relief, and attorney's fees and costs. *Id.* at 30-31.

On November 15, 2019, DoorDash filed this motion to compel arbitration and stay the

litigation. ECF No. 17. Plaintiffs filed an opposition, ECF No. 21, and DoorDash filed a reply, ECF No. 22. The Court took the motion under submission without a hearing.

### B. Arbitration Provisions

Theiss signed up for a DoorDash account on March 4, 2019, and Peter signed up on May 8, 2019. ECF No. 17-1 ¶¶ 5-6. Both Plaintiffs entered their names, email addresses, phone numbers, and passwords on a sign-up screen. *Id.* ¶ 7. To complete the process and place an order, they clicked a "Sign Up" button below this information. *Id.* Directly below that button was a statement reading: "By tapping Sign Up, Continue with Facebook, or Continue with Google, you agree to our Terms and Conditions and Privacy Statement." *Id.* The words "Terms and Conditions" appeared in blue text and were hyperlinked to the DoorDash Terms and Conditions in effect at the time ("2018 T&C"). *Id.* ¶ 8. Plaintiffs and other DoorDash users were not required to click through to the T&C in order to complete the sign-up process. *Id.* ¶¶ 8-9.

Section 12 of the 2018 T&C, entitled "Dispute Resolution," contained an arbitration agreement. *Id.* at 22. The agreement read, in relevant part:

> You agree that any dispute or claim relating in any way to your access or use of the Services as a consumer of our Services, to any advertising or marketing communications regarding the Company or the Services, to any products or services sold or distributed through the Services that you received as a consumer of our Services, or to any aspect of your relationship or transactions with Company as a consumer of our Services will be resolved by binding arbitration, rather than in court . . . .

*Id.* at 23.

The agreement also included a "delegation clause" providing that "[t]he arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable." *Id.* at 23.

The 2018 T&C allowed users to opt out of the arbitration agreement within 30 days of signing up for DoorDash. *Id.* The second paragraph of the T&C, in capitalized text, included a warning about the arbitration agreement and class waiver and a reference to the user's right to opt

out. *Id.* at 16. The 2018 T&C also stated that "the Company reserves the right to modify the terms and conditions of this Agreement or its policies relating to the Website, Software or Services at any time, effective upon posting of an updated version of this Agreement on the Website or Software" and that "continued use of the Services after any such changes constitutes your agreement to such changes." *Id.* at 16.

After completing the sign-up process, neither Peter nor Theiss opted out of the arbitration agreement. *Id.* ¶ 13. In August 2019, DoorDash posted an updated Terms of Service ("2019 T&C"). *Id.* ¶ 14. The 2019 T&C contained a substantially similar arbitration agreement and warning as well as a materially identical class waiver and delegation clause. *Id.* at 29, 35-36. Peter did not use DoorDash after this point, but Theiss continued to use the company's services and did not opt out of the 2019 arbitration agreement. *Id.* ¶ 15.

## II. JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d). *See* ECF No. 1 at 3.

## III. LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9 U.S.C. § 2. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

On a motion to compel arbitration, the court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Where the claims alleged in a complaint are subject to arbitration, the Court may stay the action

3

pending arbitration. *Id.* § 3.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

## IV.   DISCUSSION

Plaintiffs contend the Court should deny DoorDash's motion because the parties never reached a valid, binding contract given that DoorDash failed to provide reasonable notice of the T&C. ECF No. 21 at 5-6. They further argue that the Court, and not an arbitrator, must determine the question of contract formation. DoorDash argues that the T&C's delegation clause extends to questions of arbitrability, meaning that the arbitrator, not the Court, should decide "whether there is a valid agreement to arbitrate" and "whether the agreement covers the dispute." ECF No. 17 at 15-17 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002)). In the alternative – if the Court reaches the question of contract formation – DoorDash argues that the parties reached a valid contract. *Id.* at 17-21.[1]

### A.   Delegation

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original) (internal citations omitted). Whether the court or the arbitrator decides arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam*, 537 U.S. at 83 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of America*, 475 U.S. 643, 649 (1986)).

However, while challenges to the validity of a contract containing an arbitration clause are decided by the arbitrator, "challenges to the very existence of the contract are, in general, properly directed to the court." *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir.

---

[1] DoorDash's reply brief addresses only whether the parties formed a valid contract, and does not respond to Plaintiffs' arguments regarding delegability. ECF No. 22.

2017).  This is because "[a]rbitration is a matter of contract and a party cannot be required to submit any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  While the Court generally resolves ambiguities in arbitration agreements in favor of arbitration, it resolves ambiguities as to the delegation of arbitrability in favor of court adjudication.  *See Kaplan*, 514 U.S. at 944-45.

Plaintiffs argue that they did not consent to the T&C and thus no contract was formed.  ECF No. 21 at 9.  Because this is a challenge to "the very existence of the contract," this question cannot be delegated to the arbitrator.  *Kum Tat*, 845 F.3d at 983.

### B.     Contract Formation

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *Kaplan*, 514 U.S. at 944.  While the 2018 and 2019 T&C's both contain Delaware choice-of-law provisions, *see* ECF No. 17-1 at 25, 39, applying these provisions would presume that a contract had been formed.  The Court therefore applies California's choice-of-law rules.  *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001)) ("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law."); *Eiess*, 404 F. Supp. 3d at 1949 (citation omitted) (where "the underlying basis for CAFA jurisdiction is diversity, the forum state's choice of law rules apply").

In California, "[g]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 919 (2001) (citation omitted).  When that occurs, the foreign-law proponent "must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it."  *Id.*  Because both parties invoke California substantive law, however, *see* ECF No. 21 at 10; ECF No. 22 at 5, that is the law the Court will apply.

In California, "[a] party petitioning the court to compel arbitration bears the burden of

5

proving by a preponderance of evidence the existence of an arbitration agreement." *Olvera v. El Pollo Loco, Inc.*, 173 Cal. App. 4th 447, 453 (Cal. Ct. App. 2009) (internal citation omitted), *abrogated on other grounds by Concepcion*, 563 U.S. at 339. An essential element of a contract is consent. Cal. Civ. Code § 1550; *see also Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (Cal. Ct. App. 1999) ("To form a contract, a manifestation of mutual assent is necessary."). Assent is evaluated by an objective standard. *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Cal. Ct. App. 1972).

Plaintiffs argue that they did not consent to the T&C because DoorDash did not provide reasonable notice of those terms. ECF No. 21 at 12-13. The Ninth Circuit has held that an online contract must put a website user on actual or inquiry notice of its terms. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Whether a user has inquiry notice of such an agreement "depends on the design and content of the website and the agreement's webpage." *Id. Nguyen* distinguished between two forms of online contracts: (1) "clickwrap" agreements, "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use," which courts generally enforce, and (2) "browsewrap" agreements, "where a website's terms and conditions are generally posted on the website via a hyperlink at the bottom of the screen," which courts view with skepticism. *Id.* at 1175-76. A third category of agreement has become known as a "sign-in wrap," in which a website "notif[ies] the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise[s] the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019). Courts find these agreements valid "where the existence of the terms was reasonably communicated to the user." *Meyer*, 868 F.3d at 76 (collecting cases); *see also Colgate*, 402 F. Supp. 3d at 764.

Plaintiffs argue that they were not on notice of the T&C because the text informing them that signing up for an account would constitute agreement to the terms was "displayed as a gray font on a lighter-shade of gray background" and the font was "unreasonably small." ECF No. 21 at 15. Plaintiffs additionally argue that, even if they had clicked through to the T&C, the terms

6

would not have been readable on smartphones. *Id.* at 17. They cite two cases for their readability argument. In *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 980-81 (E.D. Cal. 2000), decided well before the Ninth Circuit's current browsewrap decisions, the court questioned whether a website's notice of a license agreement was sufficient where that notice was "provided by small gray text on a gray background" and was not underlined to indicate a hyperlink to the terms of the agreement. Despite these concerns about the adequacy of notice, however, the court did not invalidate the agreement. *Id.* at 982. In *Conservatorship of Link*, 158 Cal. App. 3d 138, 141 (Cal. Ct. App. 1984), the court invalidated a liability release printed in 5.5-point font, holding that "[t]ypeface smaller than eight-point is an unsatisfactory reading medium." The contract in that 1984 case, however, was printed on paper. Plaintiffs cite no authority regarding acceptable font size in the digital context.

By contrast, DoorDash cites numerous cases in which courts have enforced agreements with substantially similar forms of notice. ECF No. 22 at 6-9. In *Meyer*, for example, the Second Circuit evaluated whether Uber's registration process afforded users sufficient notice of its terms and conditions under California law. 868 F.3d at 78. In that case, the second page of the registration process, in which users entered their payment information, included the text, "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Id.* at 71. The text sat below the "register" button, and the capitalized language was blue and underlined and hyperlinked to the terms at issue. *Id.* The court held that this notice was "reasonable as a matter of California law" because the screen was "uncluttered," the text "appear[ed] directly below the buttons for registration," and "[t]he entire screen [wa]s visible at once" such that the user did "not need to scroll beyond what is immediately visible to find notice of the Terms of Service." *Id.* at 78. Though the text was "in a small font, the dark print contrast[ed] with the bright white background, and the hyperlinks [we]re in blue and underlined." *Id.*

DoorDash's sign-up page looks markedly similar to the page approved by *Meyer*. The screens are similarly uncluttered and wholly visible, and the notice text appears even closer to the sign-up button on DoorDash's page than on Uber's. *See* ECF No. 22 at 7 (comparing page in *Meyer*, 868 F.3d at 81, with ECF No. 17-1 at 14). Despite Plaintiff's characterization of the font

7

1  as gray-on-gray, the text contrasts clearly with the background and is plainly readable.  ECF No.

2  17-1 at 14.  Unlike Uber's page, however, DoorDash's does not capitalize or underline the

3  hyperlinks to its terms.  ECF No. 22 at 7.  A court evaluating a similar sign-in screen displaying a

4  hyperlink to terms of service in a different color but with no other emphasis held that this display

5  was not sufficient to establish inquiry notice.  *Colgate*, 402 F. Supp. 3d at 765-66.

6      *Colgate* is distinguishable.  Unlike DoorDash's page, the *Colgate* sign-in page included

7  another hyperlink that was bolded, underlined, and in a larger font.  *Id.* at 766.  The court worried

8  that users would not know that the second link was in fact a link given the greater emphasis

9  attending the earlier-appearing link.  *Id.*  By contrast, DoorDash's sign-in page includes two

10  hyperlinks, to its T&C and privacy statement.  ECF No. 17-1 at 14.  The hyperlinks are both in

11  blue, indicating to users that they are clickable; a user would not need to "click on every word of

12  the sentence in case one of them is actually a link."  *Colgate*, 402 F. Supp. 3d at 765; *see also*

13  *Swift v. Zynga Game Network*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (colored hyperlink

14  provided notice of terms of service).

15      Based on these authorities and a plain reading of the sign-in page, the Court holds that

16  Plaintiffs were on inquiry notice of DoorDash's T&C and that they are bound by its terms.

17      **C.**     **Arbitrability**

18      Putting the question of contract formation aside, Plaintiffs do not contest the validity of the

19  arbitration agreement or whether it covers their claims.  ECF No. 21 at 5-6.  Because the Court

20  holds that Plaintiffs did assent to the T&C, they are bound to arbitrate their claims arising out of

21  DoorDash's tipping policy.

22      **CONCLUSION**

23      For the foregoing reasons, the Court GRANTS DoorDash's motion to compel arbitration

24  and stays the proceedings.

25      The parties shall submit status reports to the Court within 180 days of the filing date of this

26  order, and additional joint status reports every 180 days thereafter, apprising the Court of the

27  status of the arbitration proceedings.  Within fourteen days of the completion of the arbitration

28  proceedings, the parties shall jointly submit to the Court a report advising the Court of the

outcome of the arbitration, and a request that the case be dismissed or that the case be reopened and a case management conference be scheduled.

**IT IS SO ORDERED.**

Dated:  April 23, 2020



JON S. TIGAR
United States District Judge